IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                         PLAINTIFF

      v.               Case No. 2:22-CR-20002-PKH-1

PEDRO ARMANDO NAVA                                               DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant, Pedro Armando Nava ("Nava"), filed a Motion to Suppress and Brief in Support on May 27, 2022.  (ECF No. 25).  The motion was referred to the undersigned for report and recommendation on June 1, 2022.  (ECF No. 27).  The Government filed its Response on June 10, 2022.  (ECF No. 28).  An evidentiary hearing on the motion was held on July 8, 2021.  (ECF No. 30).

Following a thorough review of the motion, response, the briefs, dash camera video, exhibits, and witness testimony in this case, and for the reasons stated below, it is recommended that the Motion to Suppress (ECF No. 25) be DENIED.

### I.     BACKGROUND

#### A.     The Traffic Stop and Vehicle Search

On January 22, 2022, Nava, a resident of Redlands, California, and his passenger, Maira Palacio ("Palacio"), were traveling eastbound in a white Nissan Altima at about mile marker 3 on Interstate 40 in Crawford County, Arkansas, within the Western District of Arkansas.  At approximately 8:42 a.m., Arkansas State Trooper Joshua Elmore ("Trooper Elmore") initiated a traffic stop of Nava for crossing over the fog line and the vehicle having an expired registration sticker.  (ECF No. 25-1, Defendant's Exhibit A, Incident Report).  Dash camera video from

1

Trooper Elmore's patrol vehicle documents the stop, the interaction between Trooper Elmore and the occupants of the vehicle, Trooper Elmore's conversation with Nava while seated in the front seat of the patrol car, the subsequent search of the vehicle, and ultimately Nava's arrest.  (ECF No. 25-2, Defendant's Exhibit B).

After Nava brought his vehicle to a stop in the Arkansas Welcome Center parking lot, Trooper Elmore approached the passenger side of the vehicle.  According to his Incident Report, he explained the reason for the stop,[1] and "while speaking to them, I could smell the odor of marijuana coming from inside the vehicle."  (ECF No. 25-1, Defendant's Exhibit A, Incident Report, p. 2).  Trooper Elmore did not say anything to Nava about the smell of marijuana at that moment, but he asked Nava to exit the car and sit in the front seat of the patrol car, which Nava did.

During the conversation in the patrol car, it was determined that Nava had rented the Nissan Altima, and Nava acknowledged that he became aware of the registration being expired after he started on his trip.  It was a one-way rental from California due to be returned in New York on January 24, 2022.  Trooper Elmore asked about Nava's travel plans, and Nava stated they were driving to North Carolina to see his aunt, and when questioned further about their destination, Nava said, "I think it's Charlotte, North Carolina, Charlotte."  When asked his aunt's name, Nava stated, "my aunt?" and then said, "it's, uh, Penny."  Nava explained they were driving to North Carolina and then on to New York to take a flight back to California.  Trooper Elmore commented on the quick nature of the trip, since the rental agreement showed that the car had to be returned

---

[1] Trooper Elmore explained that he stopped the vehicle because it crossed over the fog line, and Nava can be heard on the dash cam video disputing this.  The dash cam video clearly shows that Nava's car first approached and briefly touched the fog line, moved slightly back to the left, then as a truck pulling a trailer passed Nava's vehicle on the left, he again drifted to the right and briefly crossed over the fog line but not so far as to contact the rumble bars cut into the shoulder of the roadway.

just two days later, on January 24, 2022, and Nava stated he thought the return was to be made on January 25, 2022.  Trooper Elmore thought Nava was unsure of the details of his trip, and he noticed that Nava was fidgety and trembling, suggesting he was nervous.  Trooper Elmore then asked Nava how much "weed" was in the car, and Nava responded that he had a joint in the left side door.

Trooper Elmore asked Nava to remain in the patrol car, and he spoke with Palacio separately about the details of their trip.  She responded that they were just out "driving around" and she did not know where they were going.  Trooper Elmore stated that Palacio visibly shaking. He thought it was very odd that she did not know where she was going.

During the evidentiary hearing on Nava's motion to suppress, Trooper Elmore testified that he has been employed by the Arkansas State Police since 2014.  He stated that he makes approximately 100-300 traffic stops each month, and that he receives "interdiction training" for one week each year.  Regarding the stop of Nava's vehicle, he explained that the registration sticker on the car's California license plate was red, which indicated to him that it expired in 2021.  He testified that the vehicle came close to the fog line, then it crossed over the fog line, and he was concerned that the driver could be impaired, drowsy, or nervous.  Upon stopping the vehicle and contacting the occupants through the passenger side window, Trooper Elmore testified that he smelled the odor of marijuana inside the car.  He made up his mind to search the car at that point. He also observed Nava wearing a "Cookies" brand shirt, which he knew to be "a marijuana brand."[2]

Trooper Elmore moved Nava to the back seat of his patrol car before conducting the search of Nava's vehicle.  He had already called ASP Trooper Chris Short for backup during the search.

---

[2] The company describes itself as "an internationally recognized underground player within the world of fashion, cannabis, sports and music."  *See* cookiessf.com/pages/new-about-page (last accessed on July 18, 2022).

Trooper Short placed Palacio in the back seat of his patrol car. As Nava had indicated, a marijuana joint inside a white plastic tube was found in the driver's side door pocket. As the search proceeded, four suitcases were found in the trunk of the vehicle. These all looked to be empty, with only packing paper inside them. This seemed odd for a multi-day cross-country trip, and the two Troopers can be overheard on the dashcam video wondering whether a drop-off of narcotics had already occurred. They could not smell marijuana in the trunk or suitcases. The Troopers spent about 40 minutes in searching the car, even using a portable x-ray device, and they examined the suitcases on a couple of occasions during that time. Nearing the end of the search, Trooper Short noticed that the suitcases seemed heavier than they should be, since they were ostensibly empty. Trooper Elmore agreed, and a closer examination of the suitcases revealed two custom-fitted plastic packages hidden under the liner of each suitcase. A total of eight packages weighing approximately 24 pounds were found. Trooper Elmore field tested one of the packages, and it tested positive for the presence of cocaine. Both Nava and Palacio were placed under arrest.[3]

### B.      Procedural History

On January 28, 2022, a Criminal Complaint was filed charging Nava with possession with intent to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). (ECF No. 1). An initial appearance was held by Zoom videoconference on February 2, 2022, and Nava waived the issues of probable cause and detention. (ECF No. 9). Counsel was appointed to represent Nava (ECF No. 11) and an Order of Detention was entered (ECF No. 12).

An Indictment was issued on March 2, 2022, charging Nava in Count One with possession with intent to distribute a controlled substance, namely more than one kilogram of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation

---

[3] After being transported to the Drug Task Force Office, Nava claimed ownership of all the contraband while being interviewed, and Palacio was released with no charges.

of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(i), and in Count Two with possession with intent to distribute a controlled substance, namely more than 500 grams of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii)(II).  (ECF No. 13).  Nava was arraigned on March 3, 2022, at which time he entered a not guilty plea to the Indictment.  (ECF No. 17).  The case is presently set for jury trial on September 26, 2022.  (ECF No. 32).

Nava filed his pending Motion to Suppress on May 27, 2022.  (ECF No. 25).  He seeks the suppression of any statements he made to law enforcement on January 22, 2022, which he argues were taken in violation of the Fifth Amendment to the United States Constitution and *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), and any physical evidence seized from the vehicle because of these statements.  He also seeks suppression of the physical evidence because the officer lacked probable cause to conduct a warrantless search of the vehicle based upon the odor or presence of marijuana, and he urges the Court to adopt an "odor plus" standard regarding the odor of marijuana.  (*Id*., pp. 10-17).  Nava contends the "fruit of the poisonous tree" doctrine precludes the introduction of all evidence seized from the search.  (*Id*., pp. 17-19).

In its Response filed June 10, 2022, the United States asserts there was no custodial interrogation of Nava which would have triggered a *Miranda* warning, but only permissible basic investigatory questions stemming from the traffic stop.  (ECF No. 28, pp. 5-8).  The United States further contends that Trooper Elmore had sufficient probable cause to conduct a warrantless search of Nava's vehicle based on the odor of marijuana coming from the vehicle, and that the "odor plus" standard urged by Nava is contrary to Arkansas law and Eighth Circuit precedent.  (*Id*., pp. 9-14).

An evidentiary hearing on the motion was conducted on July 8, 2022. (ECF No. 30). Trooper Elmore's Incident Report dated January 22, 2022, was received in evidence as Defense Exhibit A. (ECF No. 25-1). Trooper Elmore's dash cam video was received in evidence as Defense Exhibit B. (ECF No. 25-2). The Government called Trooper Elmore to testify at the motion hearing. (ECF No. 30-1).

## II.    DISCUSSION

Nava contends he was in custody and interrogated in violation of the Fifth Amendment to the United States Constitution and *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). He also argues that Trooper Elmore lacked probable cause to conduct a warrantless search of the vehicle based upon the odor or presence of marijuana, and he urges the Court to adopt an "odor plus" standard regarding the odor of marijuana since hemp and medical marijuana are legal in Arkansas.

## A.    Applicable Law

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). Of relevance here, the "automobile exception," first recognized in *Carroll v. United States*, 267 U.S. 132 (1925), permits the warrantless search of an automobile if the police "had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began." *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003); *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v.*

*Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).

"Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005)). When making the probable-cause determination, the Court is to "apply a common sense approach and consider all relevant circumstances." *Id.* In doing so, the Court is to consider the training and experience of the officer making the stop and should "give 'due weight' to any inferences [the trooper] was able to draw from the facts known to him." *United States v. Valle Cruz*, 452 F.3d 698, 703 (8th Cir. 2006) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). In this regard, inconsistent stories, when combined with other facts, can give rise to probable cause to search a vehicle. *See United States v. Ameling*, 328 F.3d 443, 449 (8th Cir. 2003) (holding that "apparently false statements and inconsistent stories" from a driver and a passenger questioned separately by officers contributed to the officers' correct conclusion that they had probable cause to search a vehicle); *United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001) (abrogated on other grounds by *Rodriguez v. United States*, 575 U.S. 348 ( 2015)) (contradictory statements are "indicators of criminal activity"); *United States v. Edmisten*, 208 F.3d 693, 694 (8th Cir. 2000), *cert. denied*, 531 U.S. 1179 (2001) (contradictory statements); and *United States v. Wood*, 106 F.3d 942, 946-47 (10th Cir. 1997) (unusual travel plans may provide an indicia of reasonable suspicion).

The Fifth Amendment of the United States Constitution provides that, "No person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Further, in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the United States Supreme Court held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from

custodial interrogation of a defendant unless it demonstrates use of procedural safeguards effective to secure the privilege against self-incrimination.  It is well settled that *Miranda* warnings are necessary when an individual is both in custody and interrogated.  *United States v. Axsom*, 389 F.3d 496, 500 (8th Cir. 2002).

A person is "in custody" for purposes of *Miranda* if a reasonable person in his situation would not have felt free to terminate the interrogation and leave.  *United States v. Cowan*, 674 F.3d 947, 957 (8th Cir. 2012).  Citing *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990), the Court in *Cowan* set forth six non-exclusive indicia of custody: (1) whether police told the suspect "that the questioning was voluntary," the suspect could leave or ask the officers to do so, "or that the suspect was not considered under arrest"; (2) whether the suspect's movement was restrained during the questioning; (3) "whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions"; (4) whether police used "strong arm tactics or deceptive stratagems" during questioning; (5) "whether the atmosphere of the questioning was police dominated"; and (6), whether the suspect was arrested at the end of the questioning.  "[T]he critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way."  *United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006) (quoting *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (internal quotation marks omitted)).

A question is an interrogation if it is "reasonably likely to elicit" incriminating information.  *Pennsylvania v. Muniz*, 496 U.S. 582, 600-01 (1990).  Interrogation does not, however, include "request[s] for routine information necessary for basic identification purposes."  *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) (quoting *United States v. McLaughlin*, 777 F.2d 388, 391-92 (8th Cir. 1985) (internal quotation marks omitted)).  And, relevant here, the Supreme Court

has likened traffic stops to *Terry*[4] stops for purposes of warnings and has held that *Miranda* warnings are not required. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *Pennsylvania v. Bruder*, 488 U.S. 9, 10 (1988) (ordinary traffic stops do not involve custody for purposes of *Miranda*); *Howes v. Fields*, 565 U.S. 499, 509-10 (2012) (the "temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody").

The government bears the burden of showing the admissibility of a statement, or that an exception to the *Miranda* requirement applies. *United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005).

### B.     Trooper Elmore's Questioning of Nava

Nava argues that he was in custody and subject to interrogation, and therefore, any statements he made to Trooper Elmore on the day of his arrest should be suppressed because he was not advised of his rights pursuant to the Fifth Amendment and *Miranda*. He asserts that he was told to get into the patrol car, asked to reveal incriminating information, and subsequently told he could not leave. He seeks the suppression of any statements he made to law enforcement on January 22, 2022, and any physical evidence seized from the vehicle because of these statements. The facts of record, however, show the same non-coercive aspects as in *Berkemer*, and a *Miranda* warning was not required.

If one lesson for those who would transport illegal narcotics across country can be gleaned from the events in question, it is this: Do not rent and travel in a vehicle with expired registration tags. That Nava was traveling in a vehicle with expired California registration tags is what first

---

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

drew Trooper Elmore's attention to him.  Then, after Nava's vehicle drifted over the fog line, and with concern that the driver was impaired or sleepy, Trooper Elmore initiated the traffic stop.

For a police officer to make a traffic stop, he must have probable cause to believe that the vehicle has violated a traffic law.  *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012) ("A traffic stop is a seizure, so it must be supported by reasonable suspicion or probable cause.").  Operating a motor vehicle on Arkansas roadways with expired registration tags is unlawful.  Ark. Code Ann. § 27-14-304.  And any traffic violation, however minor, provides probable cause for a traffic stop.  *United States v. Maurstad*, 35 F.4th 1139, 1143 (8th Cir. 2022) (citing *Hollins*, 685 F.3d at 706); *United States v. Long*, 320 F.3d 795, 799 (8th Cir. 2003) (police officer had probable cause to make traffic stop of vehicle for expired dealer's tag).  Here, Trooper Elmore clearly had probable cause to stop Nava's vehicle because its California registration tag was expired.

Next, it is well settled that a trooper conducting a valid traffic stop is entitled to ask the motorist to accompany the trooper to the patrol car, and once inside the patrol car, to question the motorist about the nature and purpose of his trip.  *United States v. Perez*, 200 F.3d 576, 579 (8th Cir. 2000); *United States v. McCarty*, 612 F.3d 1020, 1025 (8th Cir. 2010).  That is what occurred in the present case.  Upon stopping the vehicle and contacting the occupants through the passenger side window about the reason for the stop, Trooper Elmore reported and testified that he smelled the odor of marijuana inside the car.  He made up his mind to search the car at that point but said nothing to Nava about it.  It was a cold January morning, and Trooper Elmore asked Nava to exit the car and sit in the front seat of the patrol car, which Nava did.  Nava's passenger, Palacio, was permitted to remain in their car at that time, although at one point she asked if she could get out of the car and Trooper Elmore instructed her to stay in the vehicle.  Trooper Elmore did not advise

Nava that he was under arrest, place Nava in handcuffs, or otherwise restrain Nava at that point of the encounter.

During the conversation in the patrol car, Trooper Elmore determined that Nava had rented the vehicle, and they discussed that the registration for the vehicle was expired.   Nava acknowledged that he became aware of the registration being expired after he started on his trip. It was a one-way rental from California due to be returned in New York on January 24, 2022. Trooper Elmore asked about Nava's travel plans, and Nava stated they were driving to North Carolina to see his aunt, and when questioned further about their destination, Nava said, "I *think* it's Charlotte, North Carolina, Charlotte."  When asked his aunt's name, Nava stated, "my aunt?" and then said, "it's, uh, Penny."  Nava explained they were driving to North Carolina and then on to New York to take a flight back to California.   Trooper Elmore commented on the quick nature of the trip, since the rental agreement showed that the car had to be returned just two days later, on January 24, 2022, and Nava stated he thought the return was to be made on January 25, 2022. Nava seemed unsure of the details of his trip, and the Trooper noticed that Nava was fidgety and trembling, suggesting he was nervous.   Trooper Elmore also noticed that Nava was wearing a "Cookies" brand shirt, which he knew to be "a marijuana brand."   Having already smelled marijuana inside the vehicle, Trooper Elmore asked Nava how much "weed" was in the car, and Nava responded that he had a joint in the left side door.

Trooper Elmore left Nava in the patrol car and spoke with Nava's passenger, Palacio, about the details of their trip.   As previously noted, she responded that they were just out "driving around" and she did not know where they were going.   Trooper Elmore noticed that Palacio was visibly shaking, suggesting nervousness, and he thought it suspicious that she would describe a

cross-country journey from California to North Carolina and New York as just "driving around" and that she did not know where she was going.

Having already smelled marijuana inside the vehicle, and given other facts, including Nava's and Palacio's inconsistent and uncertain stories and their unusual cross-country travel plans, Trooper Elmore felt there was probable cause to believe that Nava's vehicle contained contraband or other evidence of a crime, and he initiated a search of Nava's vehicle, ultimately finding eight packages of illegal narcotics (approximately 24 pounds of heroin and cocaine) cleverly concealed in four apparently empty suitcases.

In *Berkemer v. McCarty, supra.*, the United States Supreme Court addressed the question of whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered "custodial interrogation." Like Nava in the instant case, the respondent in *Berkemer* urged the court to find a roadside questioning to be a "custodial interrogation" on the ground that *Miranda* by its terms applies whenever "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The Supreme Court first acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" of the detained vehicle, and that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief." 466 U.S. at 436-37 (citation omitted). It declined, however, "to accord talismanic power to the phrase in the *Miranda* opinion emphasized by respondent," and focused on "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id*. at 437.

The Supreme Court found that two features of an ordinary traffic stop mitigate against the danger that a person questioned will be induced "to speak where he would not otherwise do so freely."[5] "First, the detention of a motorist pursuant to a traffic stop is presumptively temporary and brief," and as such, it is "quite different from stationhouse interrogation." *Id*. at 437-38. "Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id*. at 438. The public nature of a typical traffic stop, with passersby who could witness the interaction of the officer and motorist, was found to substantially offset the pressure on the detainee to respond to questions. *Id*. And the fact that the detained motorist typically is confronted by only one or two police officers further "mutes his sense of vulnerability." *Id*. Because of these factors, the Supreme Court found that "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself … and in the subsequent cases in which we have applied *Miranda*." *Id*. at 438-39.

The Supreme Court likened the usual traffic stop more to a *Terry* stop than to a formal arrest. *Id*. at 439. That means an officer may ask the detainee "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions," but the detainee is not obliged to respond, and unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. *Id*. at 439-40. Finding the noncoercive aspect of an ordinary traffic stop to be similar, and that a detained motorist's "freedom of action [was not] curtailed to 'a degree associated with formal arrest,'" the Supreme Court held that persons temporarily detained pursuant to such traffic stops are not "in custody" for the purpose

---

[5] Quoting *Miranda*, 384 U.S. at 467.

of *Miranda*. *Id*. at 440. The Supreme Court held similarly four years later in *Pennsylvania v. Bruder*, 488 U.S. 9, 10 (1988), a case involving facts nearly identical to *Berkemer*.

The facts in the present case fall squarely within the Supreme Court's holdings in *Berkemer* and *Bruder*. The detention and questioning were brief, took place in a public area, and involved only one officer.[6] Trooper Elmore had Nava sit in the front seat of the patrol car with him; he did not advise Nava that he was under arrest, but indicated that Nava would soon be on his way again; and he did not place Nava in handcuffs or otherwise restrain Nava during the questioning. While Trooper Elmore had already decided to search the vehicle because of the smell of marijuana coming from inside the vehicle, he did not communicate that to Nava, and as noted in *Berkemer*, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time," and "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id*. at 442. So, just as in *Berkemer*, a reasonable man in Nava's position would not have understood himself to be under arrest and in custody at the time of questioning. Even if a reasonable motorist in Nava's circumstances would not have felt free to leave, that does not amount to custody. *See United States v. Johnson*, 954 F.3d 1106, 1111 (8th Cir. 2020) ("A motorist, or anyone else, is in custody for *Miranda* purposes when his 'freedom of action ha[s] been curtailed to a degree associated with formal arrest, and that belief [is] reasonable from an objective viewpoint.'"); *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (*Miranda* warnings are not required where the motorist is not subject to the functional equivalent of a formal arrest).

Accordingly, there is no showing of a Fifth Amendment and *Miranda* violation, and Nava's statements made during the questioning are not subject to suppression.

---

[6] A second officer arrived later to assist in the search of the vehicle.

### C.        Probable Cause to Search Nava's Vehicle

Next, Nava contends that Trooper Elmore lacked probable cause to conduct a warrantless search of the vehicle.  He argues the odor of marijuana alone no longer provides probable cause to search a vehicle because medical marijuana and industrial hemp are legal in Arkansas, and that the totality of the circumstances in this case fall well below what would justify the issuance of a warrant to search Nava's automobile.  The Court disagrees.

Nava provides a short primer on The Federal Farm Bill and Arkansas legislation which legalized possession of hemp products, noting that hemp and marijuana derive from the same species of plant, and that botanically hemp is nearly indistinguishable from marijuana in all aspects, including odor.  Considering the changes in the legal status of hemp federally and in Arkansas, Nava urges re-examination of court holdings to the effect that the smell or visual identification of marijuana alone constitutes probable cause for a search.  His argument has some support, as he cites authorities from jurisdictions (other than Arkansas and the Eighth Circuit) where some courts have adopted an "odor plus" approach to the issue.  He concedes, however, that the Eighth Circuit has previously held that the odor of marijuana alone provides probable cause for the warrantless search of a motor vehicle.

Nava is right about that point.  The Eighth Circuit "has held numerous times that the smell of marijuana coming from a vehicle during a proper traffic stop gives an officer probable cause to search for drugs."  *United States v. Smith*, 789 F.3d 923, 928 (8th Cir. 2015); *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020) ("We have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception.").  Regardless of whether the odor of marijuana is faint or strong, the odor combined with credible

testimony of an officer justifies the search of a vehicle and its contents. *Smith*, 789 F.3d at 929. That precedent is controlling in the Eighth Circuit.

The Court also finds it significant that after the passage of Amendment 98 to the Arkansas Constitution in 2016, which legalized medical marijuana in the state, Arkansas courts have continued to hold that the odor of marijuana justifies a vehicular search. *Colen v. Arkansas*, 643 S.W.3d 274, 280 (Ark. App. 2022) ("[W]e have held that the odor of marijuana coming from a vehicle is sufficient to arouse suspicion and provide probable cause for the search of that vehicle.").

Having smelled[7] marijuana inside Nava's car, Trooper Elmore had sufficient probable cause under Arkansas law and Eighth Circuit precedent to search the vehicle and its contents. Even if the applicable standard were "odor plus" as urged by Nava, Trooper Elmore had developed sufficient information, in addition to the odor of marijuana, to believe that the vehicle contained contraband or evidence of crime.

While the law would have permitted it, based on the odor of marijuana alone, Trooper Elmore did not immediately remove the occupants from the vehicle and begin his search. Instead, he took the additional steps of performing the duties related to the traffic stop and making inquiry of Nava and his passenger. He learned that the vehicle had been rented in California for a one-way trip across the country, to be dropped off in New York just two days later. Nava's unusual travel itinerary also seemed suspicious, as he claimed to be heading to Charlotte, North Carolina to visit an aunt, but he then had to drop the car off in New York the following day and was to take a flight back to California. Nava's apparent uncertainty about their travel itinerary, and who they

---

[7] Nava suggests that Trooper Elmore did not actually smell marijuana inside the vehicle, noting that although Trooper Elmore's claim to smell marijuana was documented in the Incident Report, the audio of the search belies that claim when he is heard to say, "I don't smell anything, do you?" (ECF No. 25, p. 9; ECF No. 25-2 at 9:59). This argument is undermined by the fact that a joint of marijuana was found in the car, and further, it is clear to the Court from a review of the dash cam video that Trooper Elmore's question, "I don't smell anything, do you?", related specifically to the ostensibly empty suitcases.

were going to visit, heightened Trooper Elmore's suspicion.  Trooper Elmore also noticed that Nava was wearing a "Cookie's" shirt, a brand he knew to be associated with marijuana.  When he asked Nava about "weed" in the car, Nava admitted to having a joint in the driver's side door pocket.  Not particularly concerned about that, stating "[i]t's not that big a deal," Trooper Elmore then asked Nava to stay in the front seat of the patrol car while he spoke with Nava's passenger.  Again, Palacio said they were just out "driving around" and she did not know where they were going.  Trooper Elmore noticed that Palacio was visibly shaking, suggesting her nervousness, and he thought it suspicious that she would describe a cross-country journey from California to North Carolina to New York, culminating in a cross-country flight back to California from New York, as just "driving around" and that she did not know where she was going.

The Court finds that a reasonable person, let alone an experienced, well-trained police officer, would find such information, circumstances, and statements suspicious.  From all the information Trooper Elmore obtained during this routine traffic stop, including the smell of marijuana coming from inside the vehicle, the short duration of the one-way cross-country rental, and the occupants' inconsistent and curious descriptions of their cross-country travel plans, Trooper Elmore had probable cause to search the vehicle.  Nava's Motion to Suppress should be denied.

### III.    CONCLUSION

For the reasons and upon the authorities discussed above, it is recommended that Nava's Motion to Suppress (ECF No. 25) be **DENIED**.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely written objections may result in waiver of the right to appeal questions of fact.  The parties**

17

**are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of August 2022.

/s/Mark E. Ford

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE